**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 24-1932**

MISSION INTEGRATED TECHNOLOGIES, LLC,

Plaintiff - Appellant,

v.

JOSHUA CLEMENTE; TIMOTHY CLEMENTE,

Defendants - Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Leonie M. Brinkema, District Judge.  (1:23-cv-01608-LMB-WBP)

Argued:  September 10, 2025                    Decided:  November 12, 2025

Before NIEMEYER, WYNN, and QUATTLEBAUM, Circuit Judges.

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judges Niemeyer and Wynn joined.

**ARGUED:** Laurin Howard Mills, WERTHER & MILLS, LLC, Alexandria, Virginia, for Appellant. Andrew J. Henson, TROUTMAN PEPPER LOCKE LLP, Richmond, Virginia; Rebecca LeGrand, LEGRAND LAW PLLC, Washington, D.C., for Appellees. **ON BRIEF:** Brian P. Donnelly, WERTHER & MILLS, LLC, Alexandria, Virginia, for Appellant.

QUATTLEBAUM, Circuit Judge:

This appeal stems from Tim and Josh Clemente's efforts to get Mission Integrated Technologies, LLC to "show [Josh] the money"—or, more precisely, the equity.[1] Josh worked without pay for MIT, a company founded by his father, Tim, and Tim's friend, Fahmi Alubbad. Josh was the principal designer of MIT's only product—a vehicle-mounted stairway called "ARES." Josh didn't just design the ARES for fun. Tim, MIT's president, promised Josh that he'd receive equity in return for his work. But Alubbad, MIT's majority shareholder, repeatedly vetoed an equity transfer.

Josh eventually gained some leverage. With Tim's help, he obtained a patent on the ARES design. Tim attempted to convince Alubbad that MIT should trade Josh his long-promised equity in return for the patent. It didn't work. Alubbad fired Tim, and MIT sued Tim and Josh. Among other allegations, MIT claimed that Tim breached his fiduciary duties to MIT and fraudulently induced MIT to provide confidential information to Josh. MIT claimed that Josh breached his contractual non-disclosure obligations and was unjustly enriched by MIT. And MIT claimed that Tim and Josh conspired to harm MIT's business. The district court granted summary judgment to Tim and Josh—finding the claims were either untimely or failed to present genuine disputes of material fact—and awarded attorneys' fees and costs to Tim.

---

[1] JERRY MAGUIRE (Gracie Films 1996). The film follows the titular sports agent as he tries to get a new contract for his only client, mercurial wide receiver Rod Tidwell. Unlike this appeal, the film gives all parties a happy ending. Tidwell earns an $11 million contract after catching the game-winning touchdown in a Christmas Day game, and Maguire's fledgling agency earns legitimacy.

2

We affirm the district court's rulings.

## I.

MIT is a member-managed LLC whose relevant members are F2E Holdings, LLC and Tim.[2] F2E is owned entirely by Alubbad. It holds a supermajority interest in MIT. Tim is a minority owner and, from October 7, 2013, to approximately December 15, 2023, served as MIT's president.

MIT was founded in August 2013 and is organized under the laws of Delaware, with its principal place of business in Vienna, Virginia. MIT's only product is the ARES, a vehicle-mounted staircase that could deliver personnel to an aircraft or building in a situation like a hostage crisis or police raid. ARES stands for "Articulating Rapid Entry System." J.A. 778. Below is an image of the ARES, as attached to a Lenco BearCat vehicle. *Id.* at 381.



---

[2] The third member of MIT is Kenneth Fournier, who only received his "economic interest" in 2022 and played no role in the events addressed in this appeal. J.A. 1562.

3

Josh "was never an employee or member of MIT." *Id.* at 1611. But Tim sought Josh's help designing the ARES and planned to reward him with equity from Tim's share of the company. There were two wrinkles.

First, as Josh gained access to MIT's confidential information, including work produced for MIT by contractors Cardinal Scientific, Inc. and 21st Century Group, Alubbad, and perhaps Tim, believed that Josh was bound by a non-disclosure agreement (NDA) with MIT. On August 7, 2013, Tim told Alubbad that Josh was "filling in [an] NDA[] and [would] email the signed cop[y] back to [Alubbad]," *id.* at 637, and later told Alubbad "on several occasions" that Josh had signed the NDA, *id.* at 775. Josh now says he didn't sign an NDA with MIT. And Tim now agrees.

Second, Tim giving a portion of his equity to Josh was easier said than done. In 2013, Alubbad and Tim agreed to compensate Josh with a five percent ownership interest in MIT to be taken from Tim's 25 percent share. But when Tim sought to transfer a five percent stake to Josh in 2015 and 2017, Alubbad exercised his power as MIT's majority owner to block Tim's efforts. That meant that Josh was working on the ARES without pay on a part-time basis.

And Josh kept doing that. He developed an initial version of the ARES, and, in 2017, a redesigned version. He redesigned the ARES in part thanks to the work of Cardinal Scientific, which modeled a prototype, and 21st Century, which created the software to operate the ARES wireless controller. In November 2017, MIT displayed the redesigned ARES at a trade show in France. It was "a hit." *Id.* at 1653.

4

In December 2017, Alubbad offered Josh equity, but with strings attached. Specifically, he says he offered Josh a full-time job at MIT, promised him a salary of $80,000 per year and told him that once MIT had business and had repaid its loans, Alubbad would think about giving Josh five percent ownership from F2E's share. Josh rejected Alubbad's offer.

In November 2018, Josh told Tim that he was filing a provisional patent application for the updated ARES design, and Tim "sent Josh numerous ARES documents" that Tim used when Tim filed for a provisional application in 2017. *Id.* at 1138. In November 2018, Josh filed a provisional patent application of his own, which he followed with a non-provisional application in November 2019.[3]

In the meantime, Alubbad apparently grew concerned about MIT's intellectual property rights over the ARES. On August 27, 2019, Alubbad met with his lawyer and Tim. During that meeting, Alubbad's lawyer asked Tim if he "ha[d] any patents on" or had "ever applied for" a patent on the ARES system, and Tim responded that he "applied a couple years ago for a patent pending just so [MIT] could put it in the brochure" but that he "[did] not currently have a patent." *Id.* at 2105. Tim didn't mention that Josh had submitted a provisional application of his own. But Tim did tell Alubbad and his lawyer that the ARES design was Josh's work and that MIT could not claim ownership of it without compensating Josh.

---

[3] A provisional patent application gets a patentee a placeholder filing date so long as he files a non-provisional application on the same matter within a year. 35 U.S.C. §§ 111(b), 119.

The U.S. Patent and Trademark Office published Josh's application on May 21, 2020. The patent was granted on November 16, 2021. Josh recognized that the patent gave him the leverage he needed to cash in on his work. The very next day, on November 17, 2021, Josh texted a friend to tell him that he intended to "shaft [Alubbad] with" his newly obtained patent. *Id.* at 1465, 1650. When deposed, Josh said that he "wanted to use the patent as a clear opportunity to achieve a licensing agreement with royalties or compensation of some kind for [himself]." *Id* at 1650.

In March 2022, after an investor approached Tim about the possibility of buying MIT, Tim told Alubbad about Josh's patent on ARES and suggested that MIT offer Josh a five percent stake in MIT in return for Josh transferring the patent to MIT. Alubbad says that this was when he "first learned about [Josh's] [p]atent." *Id.* at 1618.

A few months later, in the summer of 2022, Alubbad tried to negotiate the transfer of Josh's patent to MIT. But Josh refused to sign an agreement to that effect because he found some of its terms onerous.

A year and a half went by. On December 16, 2023, after tense negotiations with Tim regarding the return of confidential information, Alubbad used his power as majority shareholder of MIT to remove Tim as MIT's president.

On October 16, 2023, F2E sued Tim and Josh, purportedly on behalf of MIT. Tim and Josh removed the case to federal court. Soon after, MIT amended its complaint to assert a direct action against Tim and Josh. The amended complaint had seven counts: "breach of fiduciary duties (Count I—against Tim); misappropriation of trade secrets (Count II—against Tim and Josh); business conspiracy (Count III—against Tim and Josh); unjust

6

enrichment (Count IV—against Josh); common-law fraud (Count V—against Tim); and breach of contract (Count VI—against Josh; Count VII—against Tim)." *Id.* at 379–408. The allegations underlying these counts are as follows:

| COUNT | ALLEGATIONS |
|---|---|
| I | Tim breached his fiduciary duties to MIT as set out in MIT's Operating Agreement by, inter alia, allowing Josh to "improperly possess MIT's intellectual property" and "empowering" Josh to obtain "a patent for ARES in his own name and without assignment to MIT." *Id.* at 398. |
| II | Tim and Josh misappropriated trade secrets because Tim provided trade secrets to Josh despite Josh apparently not being subject to an NDA and Josh maintained access to and disclosed these trade secrets. |
| III | Tim and Josh worked in concert to "injure MIT's reputation, trade, business, or profession by misappropriating MIT's intellectual property, trade secrets, and other confidential business information." *Id.* at 400. |
| IV | Josh unjustly enriched himself by successfully filing a patent on the ARES system "[d]espite having no legal right to possess, use, or retain MIT's intellectual property." *Id.* at 401. |
| V | Tim committed common-law fraud by "represent[ing] to F2E on numerous occasions that Josh had executed" an NDA with "actual knowledge of [these representations'] falsity or with reckless indifference to their truth" to "induce MIT to authorize Tim to engage Josh to assist him" with ARES. *Id.* at 401–02. |
| VI | Josh breached a 2013 NDA with MIT by disclosing MIT's confidential information. |
| VII | Tim breached his contract with MIT when he failed to "return[] MIT's confidential business information and destroy[] and/or delete[] any remaining copies in his possession." *Id.* at 404. |

Josh counterclaimed for infringement of his ARES patent by MIT.

MIT voluntarily dismissed Count II of the amended complaint. Tim and Josh moved for summary judgment on all remaining counts. The district court issued oral rulings on

the motions as follows. First, as to the remaining counts against Josh—Counts III,[4] IV and

VI—the district court said:

> . . . Joshua's motion for summary judgment, first of all, is to Count 3, which is the business conspiracy. That's got a five-year statute of limitations. And it looks to the Court quite clearly that the statute of limitations has been exceeded in this case because . . . most of the issues that the plaintiff is complaining about occurred more than five-years before the time period in which this case was filed.

> Count 4 is an unjust enrichment claim. And even if the Court accepts the November 2018 date as the date when the patent was applied for, there's a three-year statute of limitations for that claim, and again, that would make the complaint time barred.

> And Count 6 is the breach of contract. And now it's been admitted that there was never a contract, so that one obviously fails.

*Id.* at 2174–75. Then, as to the remaining counts against Tim—Counts I, II, III, V and

VII—the district court said:

> In terms of Timothy, again, there are time bars on . . . all of the counts against him except for the final breach of contract claim which has to do with the 2022 agreement. That one will go forward; it's not time-barred.

> So what I'm leaving you all with today is, the case goes forward as to Count 7, which is the breach of contract claim against Timothy Clemente only, and it goes forward on the counterclaim for patent infringement.

*Id.* at 2175. MIT then voluntarily dismissed Count VII. That meant Tim and Josh defeated

MIT's claims against them. Tim then moved for attorneys' fees and costs. The district court

granted Tim's motion, awarding him $356,097.60 for fees and $18,464.10 in costs.

Even so, the case had one remaining claim—Josh's patent infringement

counterclaim. That claim went before a jury, which invalidated Josh's patent on the ARES

---

[4] This count was also against Tim.

8

design. So, when the dust settled, MIT lost on all its claims, Josh lost on his counterclaim and obtained no equity in MIT, Tim won on all the claims against him but was terminated as MIT's president and the patent protecting MIT's crown jewel was invalidated.

MIT now appeals the entry of judgment in favor of Tim and Josh on Counts I, III, IV, V and VI and the award of attorneys' fees and costs to Tim.[5] We first analyze the district court's grant of summary judgment and then turn to its award of attorneys' fees.

## II.

There are two preliminary matters to handle before we address the district court's summary judgment rulings on a count-by-count basis.

First, standard of review. "We review an award of summary judgment *de novo*." *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 364 (4th Cir. 2019). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In considering the matter on appeal, we construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Mountain Valley Pipeline*, 918 F.3d at 365.

Second, choice of law. MIT claims that the district court erred by failing to perform a choice-of-law analysis as to which state's substantive law applied to each claim dismissed as time barred. As MIT tells it, when it comes to choice of law, a district court errs by declining to spell out which state's law it is applying. But that's not so. A district court errs

---

[5] We have appellate jurisdiction over the district court's judgment as to those counts and Tim's fees-and-costs motion pursuant to 28 U.S.C. § 1291.

9

when it applies the wrong law. *See, e.g.*, *Klein v. Verizon Comms., Inc.*, 674 F. App'x 304, 308 (4th Cir. 2017). It "need not resolve the choice-of-law question" at all if "it makes no discernible difference to the relevant analysis in the case at bar." *World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 514 (4th Cir. 2015). While showing your work is good form when solving a math problem or taking a law school exam, we do not demand that district courts do so, particularly when it would require resolving thorny issues that are immaterial to the outcome of a case.

In granting Tim and Josh's motions for summary judgment, the district court didn't explicitly state what law it applied. But that wasn't an error. Below, the parties agreed that Virginia law governed the analysis on every count but Count I, so there's no reason to think the district court applied any other body of law in resolving those counts. The parties' only choice-of-law disagreement below was whether Virginia or Delaware law governed the analysis of Count I. As we will explain, even assuming that Delaware law governs Count I, as MIT contends, that count is nonetheless time barred.

With these issues out of the way, we proceed to MIT's challenges to the district court's summary judgment rulings.

**A.**

First, Count I. MIT alleges in this count that Tim breached his fiduciary duties to MIT as set out in the Operating Agreement by, inter alia, allowing Josh to "improperly possess MIT's intellectual property" and "empowering" Josh to obtain "a patent for ARES in his own name and without assignment to MIT." J.A. 398. We assume for the sake of argument that Delaware law governs the statute of limitations and its tolling on this count.

10

As we just mentioned, the parties disagree on whether Delaware or Virginia law applies to this claim. MIT contends that Count I alleges a breach of the Operating Agreement, which says that Delaware law applies to disputes under it, and Tim contends that Count I is a tort claim to which Virginia law would apply. But we needn't resolve that dispute, because even if MIT is right in insisting that Delaware's three-year statute of limitations applies, *see* DEL. CODE ANN. tit. 10 § 8106(a), its claim is time barred.[6]

Here's why. This action was filed on October 16, 2023, so Count I is barred if it accrued before October 16, 2020. Under Delaware law, contract and fiduciary claims begin to accrue "at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004) (citing DEL. CODE ANN. tit. 10 § 8106). That is, these claims accrue when the duty is breached, not at some later point when the plaintiff suffers or detects actual harm, absent some tolling doctrine. *Lehman Bros. Holdings, Inc. v. Kee*, 268 A.3d 178, 185 (Del. 2021) (breach of contract); *Lebanon Cnty. Emps. Ret. Fund v. Collis*, 287 A.3d 1160, 1196 (Del. Ch. 2022) (breach of fiduciary duty). Those tolling doctrines include equitable tolling, which applies "while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary," *Ontario Provincial Council*, 294 A.3d at 94 (quoting *In re Tyson Foods, Inc. Consol S'holder Litig.*, 919 A.2d 563, 585 (Del. Ch. 2007)), and fraudulent concealment, which

---

[6] Also, applying Virginia law would not change the outcome. While Virginia law has a longer period of limitations, if we determined that Count I were a tort claim and applied Virginia law, Count I would fail on preemption grounds. *See* VA. CODE. ANN. § 59.1-341(A) ("[T]his chapter displaces conflicting tort, restitutionary, and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret.").

11

applies "when a defendant has fraudulently concealed from a plaintiff the facts necessary to put the plaintiff on notice of the truth" through an "affirmative act of actual artifice" until the defendant is put on inquiry notice, *LGM Holdings, LLC v. Schurder*, 340 A.3d 1134, 1146 (Del. 2025) (cleaned up).

As stated in its reply brief, here's MIT's theory of accrual on Count I. The claim accrued when Tim "secretly assist[ed] Josh with the filing of a provisional patent application [on the ARES design] in November of 2018." Reply Br. at 9. November 2018 is obviously more than three years before MIT commenced the lawsuit. So, it would be time-barred. But, according to MIT, that's not a problem because during the August 27, 2019 meeting with Alubbad and Alubbad's lawyer, Tim said that he didn't have a patent on the ARES but didn't mention Josh's provisional patent. MIT insists that non-disclosure tolled the statute of limitations by equitable tolling or fraudulent concealment. Thus, MIT says that the limitations period didn't run between August 27, 2019, and March 3, 2022, when Tim informed Alubbad about Josh's patent.[7]

So, is MIT right that equitable tolling or fraudulent concealment apply? This is a close question. On the one hand, at the August 27, 2019 meeting, Tim was only asked if *he* had a patent or patent application. And his answer that he didn't wasn't false. On the other

---

[7] In its opening brief, MIT argued that Tim's attempt in March 2022 "to use Josh's ownership of the ARES Patent to extract ownership shares and other financial concessions from MIT," Op. Br. at 22, was an act that triggered accrual. But not only did MIT not reiterate this argument on reply, it affirmatively undercut it by asking us to focus on the "key allegation" that Tim breached his fiduciary duty when he helped Josh "file[] for patent protection on the ARES in his own name" in November 2018 and "actively concealed [that Josh had obtained a patent]" from August 2019 to March 2022. Reply Br. at 13. This is inconsistent with an argument that the statute of limitations began to run in March 2022.

12

hand, he didn't mention Josh's patent application, which he must have known would be of interest to Alubbad, to whom he likely owed a fiduciary relationship. But we need not resolve this question. Even if Tim's statements during the August 27, 2019 meeting justified the application of a tolling doctrine, other statements he made during the same meeting put MIT on inquiry notice as to a breach of Tim's contractual duties.

"Under Delaware law, inquiry notice universally limits tolling doctrines." *Collis*, 287 A.3d at 1212. A plaintiff has inquiry notice when it has "sufficient knowledge to raise [its] suspicions to the point where persons of ordinary intelligence and prudence would commence an investigation that, if pursued would lead to the discovery of the injury." *Ont. Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 294 A.3d 65, 96 (Del. Ch. 2023) (quoting *Pomeranz v. Museum Partners, L.P.*, No. Civ.A. 20211, 2005 WL 217039, at *3 (Del. Ch. Jan. 24, 2005)).

MIT frames Tim's breach of fiduciary duty in part as failing to "protect MIT's intellectual property" and "empowering his son, Josh, to assert ownership of MIT's intellectual property," including the ARES design. Op. Br. at 21 (quoting J.A. 398). So, it focuses on Tim's silence about Josh's patent application. But it ignores the rest of the meeting. Tim said during the August 27, 2019 meeting that he believed that Josh was the sole owner of the ARES design, that it was wrong to take from Josh "[t]he fruits of his labor without compensation," J.A. 2109, that Josh was not bound by a work-for-hire agreement, and that MIT couldn't "say [it] own[s]" the ARES design, *id.* at 2110. Sure, Tim didn't say outright that Josh was seeking to patent the ARES design for himself or that Tim was helping him do so. But inquiry notice doesn't require that the plaintiff see a fire;

13

it only requires that a plaintiff smell smoke. In our view, an actor of ordinary intelligence and prudence in MIT's shoes would have investigated whether Tim was in fact safeguarding MIT's claims to the ARES design.

For a comparable case applying Delaware law on inquiry notice, consider *Norman v. Elkin*, 961 F.3d 275 (3d Cir. 2020). There, a plaintiff sued his co-founder for conversion after his co-founder took an unauthorized distribution. *Id.* at 279. The Third Circuit determined that the plaintiff was put on inquiry notice as to this claim after a phone call in which the defendant "was 'evasive' and made the clearly disturbing statement that [the plaintiff] did not receive any distribution . . . because it was not 'his turn'" since that call "correctly prompted [the plaintiff] to investigate further and seek additional information." *Id.* at 288. MIT was arguably more primed for inquiry notice than the plaintiff in *Norman*. In *Norman*, the fact that the plaintiff "felt it necessary to enlist the assistance of counsel" after the defendant ignored his "well-founded requests for additional information" served to "underscore[] how patently unreasonable it would have been [for the plaintiff] to continue to rely on the fiduciary nature of his relationship with [the defendant] as a justification for not investigating [the defendant's] potential wrongdoing." 961 F.3d at 290 n.22. Alubbad already had his own counsel present at the August 27, 2019, meeting. And as Alubbad acknowledged when deposed, he recognized Tim's conduct in that meeting as proof that he might not be upholding his duties to MIT. *See* J.A. 565–66 ("Q: Did it concern you that Tim Clemente said that Josh Clemente owned the intellectual property he created? [ALUBBAD]: Yes, it did concern me. . . . That's why my lawyer was in discussion with him. . . . But yet, he was coming to negotiate with me. . . . He was coming to negotiate,

14

which was in violation of the operating agreement. Because Tim Clemente, as the president, he cannot negotiate on behalf of his son. His loyalty is to MIT, not to Josh Clemente . . . .").

Because MIT was on inquiry notice of this claim by the end of the August 27, 2019 meeting, Count I is time barred.

**B.**

Next, Count III. MIT alleges in this count that Tim and Josh worked in concert to "injure MIT's reputation, trade, business, or profession by misappropriating MIT's intellectual property, trade secrets, and other confidential business information." J.A. 400. While not absolutely settled, it appears that the statute of limitations on a Virginia business conspiracy claim is five years. *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 543 (4th Cir. 1997).[8] Thus, Count III is barred if it accrued before October 16, 2018. Statutory business conspiracy must be based on some underlying tort, and a cause of action for business conspiracy "does not accrue until the plaintiff suffers an injury sufficient to give rise to the underlying tort claim"—i.e., when a plaintiff can "prove every element of the underlying tort." *L-3 Comms. Corp. v. Serco, Inc.*, 926 F.3d 85, 93 (4th Cir. 2019). Below, MIT said,

---

[8] The Virginia Supreme Court "express[ed] no view as to the correctness" of applying a five-year statute of limitations to business conspiracy claims, noting other Virginia Supreme Court cases applying a two-year statute of limitations for a different cause of action. *Eshbaugh v. Amoco Oil Co.*, 360 S.E.2d 350, 351 (Va. 1987). In any event, no authority suggests that the statute of limitations is greater than five years, and as we show, MIT's business conspiracy claim is time barred even with a five-year statute of limitations.

15

"[t]he essence of MIT's conspiracy claim is that Tim and Josh fraudulently conspired to usurp MIT's intellectual property. Fraud is an intentional tort." [9] J.A. 1158.

To advance a fraud claim under Virginia law, a plaintiff must prove by clear and convincing evidence six elements: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Evaluation Rsch. Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994) (citations omitted). MIT said below that Tim acted fraudulently by "falsely inducing MIT into authorizing Josh to work on the development of the ARES as part of a conspiracy to convert MIT's intellectual property and confidential information." J.A. 1158. Tim's purportedly fraudulent act was telling Alubbad that "Josh had executed a[n NDA]," which was in fact "false." *Id.* at 402. To determine when all the elements of a fraud claim were fulfilled, and thus when Count III accrued, we consider two questions: When did Tim make the alleged false representation, and when was MIT injured?

First, the false representation. MIT says that Tim continued to misrepresent that Josh signed the NDA as recently as July 2022. But alleged false representations must be considered in the context of the rest of the elements of the alleged fraud. MIT alleges that Tim's fraudulent statements "falsely induc[ed] MIT into authorizing Josh to work on the development of the ARES as part of a conspiracy to convert MIT's intellectual property

---

[9] MIT now claims that the tort underlying its business conspiracy claim is "fraudulent concealment." Reply Br. at 16. But below, MIT spoke of fraudulent concealment only as a means of tolling the statute of limitations on Count I. In doing so, MIT waived the argument it makes here.

16

and confidential information," including through obtaining a patent. MIT also alleges that it "specifically relied on Tim's false representations in authorizing Tim to have Josh assist him in performing work on the ARES system" and "in allowing Josh to access and use MIT's intellectual property, including its trade secrets and other confidential information relating to ARES." *Id.* As such, the misrepresentations giving rise to the underlying fraud claim can't have happened in 2022, because that was well after MIT had given Josh access to its information. Rather, based on MIT's own allegations as to its reliance on the false statements, the misrepresentations must have happened in 2013, when Josh began working for MIT, or at latest in 2017, when Josh obtained "the [computer-aided design] files produced by Cardinal Scientific and the source[]code produced by 21st Century for the ARES wireless controller." Reply Br. at 18.

Second, the injury. MIT argues that it suffered injury only when the USPTO published Josh's non-provisional patent application in May 2020. Tim and Josh argue that the injury occurred "at the time Tim allowed Josh access to MIT's allegedly confidential information—which occurred in 2013, or 2017 at the latest." Resp. Br. at 31. As Tim and Josh point out, under Virginia law, "where an injury, though slight, is sustained" that is sufficient to be legally cognizable, the statute of limitations begins to run even if "the actual or substantial damages do not occur until a later date." *Street v. Consumers Mining Corp.*, 39 S.E.2d 271, 272 (Va. 1946) (quotation omitted). The exposure of MIT's confidential information to any unauthorized person constitutes harm. And the record makes it clear that Josh received confidential information without having signed an NDA. *See* J.A. 2504 (Alubbad agreeing that Josh "should never [have] had" the Cardinal Scientific files because

17

Alubbad "learned he doesn't have an NDA" to handle this "confidential information"); *id.* at 1161 (MIT arguing that the attorneys' fees it incurred in attempting to negotiate the return of its confidential information from Josh were a cognizable basis for damages). Was it *more* harmful for MIT's design to be exposed to the public via the publication of Josh's non-provisional patent application? Maybe so. But that is not the question. Any harm triggers the statute of limitations.

Because the alleged misrepresentations happened no later than 2017, and because harm occurred immediately upon Josh gaining access to MIT's confidential information, Count III is time barred.

### C.

Now, Count IV. MIT alleges in this count that Josh unjustly enriched himself by successfully filing a patent on the ARES system "[d]espite having no legal right to possess, use, or retain MIT's intellectual property." J.A. at 401. Under Virginia law, unjust enrichment occurs when "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit and should reasonably have expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for its value." *James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 650 (Va. 2020) (citing *Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008)).

The district court never addressed those elements. Instead, it dismissed this claim as time barred. To assess that ruling, we must determine when an unjust enrichment claim accrues. Under Virginia law, accrual occurs when the defendant does not pay the expected compensation for a benefit he has obtained. *Tao of Sys. Integration, Inc. v. Analytical Servs.*

18

*& Materials, Inc.*, 299 F. Supp. 2d 565, 576–77 (E.D. Va. 2004). Finding that point is difficult here because MIT doesn't allege that it expected to be paid for giving Josh access to its confidential information. But we needn't decide exactly when such a claim accrued because MIT's unjust enrichment claim has a more fundamental problem.

In our view, even if the claim was timely, there is no genuine dispute of material fact as to the last element of unjust enrichment—whether Josh obtained a benefit from his receipt of MIT's confidential information. He did not. MIT says that whether Josh obtained benefits from the patent that could be disgorged "is a question of fact that cannot be decided on summary judgment." Reply Br. at 21 n.7. But a party cannot defeat summary judgment simply by declaring in its briefing that a factual issue still exists. Our review of the record uncovers no evidence that Josh obtained any benefit from MIT's confidential information. We don't doubt that MIT incurred costs because Josh obtained a patent on the ARES—for example, legal fees from trying to negotiate the patent's transfer to MIT and, eventually, from invalidating the patent. Even so, an unjust enrichment claimant may only recover damages to the extent that the defendant was actually benefitted. *See T. Musgrove Constr. Co. v. Young*, 840 S.E.2d 337, 488 (Va. 2020). Since Josh's patent is invalidated and he obtained no other benefits from MIT's confidential information, we affirm the district court's grant of summary judgment to Josh on this count. *See United States v. Williams*, 130 F.4th 177, 184 (4th Cir. 2025) (noting that a court of appeals can affirm a district court on any ground supported by the record (citing *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018))).

19

### D.

On to Count V. MIT alleges in this count that Tim committed common-law fraud by "represent[ing] to F2E on numerous occasions that Josh had executed" an NDA with "actual knowledge of [these representations'] falsity or with reckless indifference to their truth" to "induce MIT to authorize Tim to engage Josh to assist him" with ARES. J.A. 401–02. The statute of limitations on a fraud claim in Virginia is two years. VA. CODE ANN. § 8.01-243. So, Count V is time barred if it accrued before October 16, 2021. As a reminder, the elements of fraud are: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Evaluation Rsch. Corp.*, 439 S.E.2d at 390 (citations omitted).

As we found with Count III, the purportedly false representations and ensuing harm that form the basis for this claim occurred in 2017 at the latest. But unlike a business conspiracy claim, which accrues as soon as a plaintiff could make out a claim on the underlying tort, a fraud claim only accrues "when such fraud . . . is discovered or by the exercise of due diligence reasonably should have been discovered"—that is, upon actual or inquiry notice, whichever comes first. VA. CODE ANN. § 8.01-249. So, when was MIT on notice that Josh didn't sign an NDA? "Inquiry notice is triggered by evidence of the possibility of fraud, not by complete exposure of the alleged scam." *Zeng v. Wang*, 906 S.E.2d 668, 678 (Va. Ct. App. 2024) (quoting *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993)). During the August 27, 2019 meeting, Alubbad's lawyer asked Tim whether Josh signed an NDA, and Tim said, "I don't know if he did." J.A. 2108. But

20

after Alubbad and his lawyer responded that Tim had previously "represented that [Josh] did," Tim said that "in 2013 he did, then, I guess." *Id.* Alubbad later testified in his deposition that, outside of that meeting, Tim "always assured [him] 1,000 percent, there is an NDA." *Id.* at 564.

But Alubbad was suspicious of Tim's loyalties by the August 27, 2019 meeting. Combine that suspicion with Tim's inability to produce a copy of the NDA despite repeated requests by Alubbad and Josh not responding to a request to provide a copy of the NDA in 2017. The cumulative effect of these facts is that by 2019 at the latest, MIT was put on notice as to the possibility of fraud—the possibility that Josh had not in fact signed a document that Josh wouldn't acknowledge and that Tim couldn't seem to find. And to trigger the statute of limitations, that possibility is all that is needed. As such, Count V is time barred.

### E.

Lastly, Count VI. In the amended complaint, MIT pled in the alternative to the previous claims that Josh in fact entered an NDA with MIT in 2013 and breached it:

> by, among other wrongful conduct, (a) asserting a personal interest in MIT's intellectual property; (b) publishing aspects of the ARES design without authorization; (c) otherwise disclosing MIT's intellectual property, including its trade secrets and other confidential business information, to at least one third party; and (d) refusing to return and/or destroy MIT's intellectual property, including its trade secrets and other confidential business information.

J.A. 403. The district court granted summary judgment to Josh on Count VI on the basis that "now it's been admitted that there was never a contract" between Josh and MIT. J.A. 2175.

21

MIT says there remains "a disputed issue of fact regarding whether Josh signed an agreement that subsequently was lost or whether Josh never signed an agreement in the first place." Op. Br. at 31. But no dispute remains. Below, Josh said he didn't sign an NDA. Tim agreed. And while "MIT clearly stated" that there was a material dispute of fact in some filings below, Reply Br. at 22, it didn't in others. In a document not included in the Joint Appendix, MIT stated as an undisputed fact that Josh "never signed a non-disclosure agreement with MIT." MIT's Mem. Supp. Mot. Summ. J. at 5, *Mission Integrated Techs. v. Clemente*, No. 23-cv-1608 (E.D. Va. May 10, 2025), ECF No. 77. Also, when deposed, Alubbad repeatedly said that Josh hadn't signed the NDA. *See* J.A. 2487 (Alubbad acknowledging "the fact also that there's no NDA"); *id.* at 2489 ("And now finding out that Josh doesn't have an NDA . . . ."); *id.* at 2490 ("First of all, Tim failed to have NDA signed with Josh."); *id.* at 2504 ("Because now, when I learned [Josh] doesn't have an NDA, and his father lied to me, of course."); *id.* at 2522 ("I find out that Josh, who doesn't have an NDA with MIT . . . ."); *id.* at 2649 ("[Y]ou know, Josh doesn't have an NDA, okay . . ."); *id.* at 2665 ("Let me explain something to you: Josh was never under NDA."). MIT now argues that Alubbad simply "meant that *Josh did not believe* he was under a non-disclosure agreement." Reply Br. at 23. But that's not what Alubbad said. Considering the record as a whole, even construing the evidence in the light more favorable to MIT, there was no dispute of material fact as to whether Josh signed an NDA. As such, summary judgment for Josh on Count VI was proper.

22

**III.**

We conclude by considering the district court's grant of attorneys' fees and costs to Tim. While grants or denials of attorneys' fees are generally reviewed for abuse of discretion, where the grant or denial is based on "contract interpretation grounds," we review the district court's interpretive decision—as opposed to the decision about the amount of any fees and costs—de novo. *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 186 (4th Cir. 2013).

> Section 15(G) of the Operating Agreement says:
>
> In the event of any litigation, arbitration or other dispute arising as a result of or by reason of this Agreement, the prevailing party in any such litigation, arbitration or other dispute shall be entitled to, in addition to any other damages assessed, its reasonable attorneys' fees, and all other costs and reasonable expenses incurred in connection with settling or resolving such dispute.

J.A. 69. Based on this provision, the district court granted Tim $356,097.60 in fees and $18,464.10 in costs.

Initially, MIT argues that if we find that the district court erred in granting summary judgment for Tim on any of the above counts on which he was named—Counts I, II, and V—we "necessarily must reverse the [d]istrict [c]ourt's fees award." Op. Br. at 33–34. Because, for the reasons stated above, we affirm the district court's awards of summary judgment to Tim on these counts, we don't reverse the district court's fee award on this basis.

MIT raises two other bases for overturning the fee award. First, it argues that the district court erred in failing to "indicat[e] under what body of law the District Court

23

decided the attorneys' fees motion" and to acknowledge its "discretion" under *Bako Pathology LP v. Bakotic*, 288 A.3d 252 (Del. 2022), "not to award fees to any party based on the language in the MIT Operating Agreement and the circumstances of this case." Op. Br. at 34 (citation omitted). Second, it argues that the district court was inappropriately influenced by knowledge of "offers made and positions taken in failed settlement negotiations." *Id.* Let's take these arguments one at a time.

As to the first argument, the district court didn't have to announce which state's law it was using because there was no dispute over whether the Operating Agreement should be interpreted pursuant to Delaware law. *See* J.A. 2342 ("MIT further agrees [with Tim] that the MIT Operating Agreement provides that it is governed by Delaware law." (citation omitted)).[10] That the district court didn't reference *Bako* doesn't change our conclusion. In *Bako*, the Supreme Court of Delaware found that a trial court had not abused its discretion by determining that there was no prevailing party where "[b]oth [parties] failed to exercise good business judgment and have used the justice system to obtain some form of revenge." 288 A.3d at 280 (quotation omitted). The Supreme Court of Delaware didn't hold that a trial court *must* determine that there was no prevailing party in such an instance. And at any rate, this case is distinguishable from *Bako* because here the district court placed the bulk of the blame for the lawsuit's pendency on MIT. J.A. 2397–98 ("[M]any of those claims, in my view, should never have been brought in the first place, and, of course, I

---

[10] The parties are right to agree that Delaware law governs the Operating Agreement. *See* J.A. 609 ("This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Delaware.").

24

dismissed them ultimately in the case. . . . The case should have settled, in my view, and I've said that to you many, many times. . . . I know in . . . the case of Josh, he would have settled this case, given the patent rights back to the plaintiff. All he wanted was $50,000, given the years he had worked for the company and the company not having reimbursed him for most of his work, that was not an unreasonable approach on his part. And in terms of the suit against Tim, again . . . a lot of the basis for that lawsuit was, in my view, highly questionable.").

As to the second argument, MIT hasn't shown that the district court's grant of attorneys' fees was premised on its knowledge of the substance of settlement negotiations. As Tim points out, in observing that Josh was willing to settle the case for $50,000, the district court was not referring to confidential discussions between the parties but rather was referring to an email that Josh sent in 2022. *See* J.A. 1059 (June 14, 2022, email from Josh proposing that "MIT make[] a 1 time payment of $50k" and that Josh "assign the patent to [Tim]/MIT/whoever").

Because we uphold the district court's grants of summary judgment to Tim, and because the district court did not commit any procedural error in granting attorneys' fees, we affirm the district court's grant of attorneys' fees and costs to Tim.

## IV.

MIT's claims failed at the summary judgment stage for two reasons. Its unjust enrichment and breach of contract claims against Josh failed because Josh didn't benefit from obtaining the now-invalidated ARES patent and didn't sign an NDA with MIT. As for the remainder of its claims, MIT may have had some valid complaints about what Tim

25

and Josh did. Perhaps Tim and Josh should have told Alubbad that Josh was securing a patent on MIT's only product. Perhaps Tim was more loyal to his son than to his company. But statutes of limitations are meant to ensure that litigants diligently pursue their claims, and MIT didn't do that. And because Tim defeated MIT's claims against him, the district court rightly awarded him the attorneys' fees and costs that MIT contractually owed him. For these reasons, the district court's judgment is,

*AFFIRMED.*